UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

————————————————————————x

DEBORAH A. RISBERG, derivatively on    :
behalf of ASPEN TECHNOLOGY, INC.,     :

        Plaintiff(s),            :

                       :    **C.A. NO:**

    vs.                       :

JOAN C. MCARDLE, DOUGLAS A.      :
KINGSLEY, DONALD P. CASEY, MARK E.  :
FUSCO, GARY E. HAROIAN, STEPHEN M.  :    **VERIFIED SHAREHOLDER**
JENNINGS, MICHAEL PEHL, STEVEN L.   :    **DERIVATIVE COMPLAINT**
BROWN, GRESHAM T. BREBACH, JR.,    :
DOUGLAS R. BROWN, CHARLES F. KANE,  :
MANOLIS E. KOTZABASKIS, C. STEVEN   :
PRINGLE, DAVID MCQUILLIN,        :
LAWRENCE B. EVANS, STEPHEN J.     :
DOYLE, LISA W. ZAPPALA, and MAY A.   :
PALERMO,                   :

          - and -         :

ASPEN TECHNOLOGY, INC., a Delaware   :
Corporation,                 :
         Nominal Defendant,    :

         Defendant(s).       :

————————————————————————X

Deborah A. Risberg ("Plaintiff") is a shareholder of Aspen Technology Inc. ("Aspen" or

the "Company"), and files this Verified Shareholder Derivative Complaint (the "Complaint")

pursuant to Federal Rule of Civil Procedure 23.1 on behalf of the Company against certain of its

officers and directors seeking to remedy Defendants' violations of the law, including breaches of

fiduciary duties relating to events that began as early as September 1997 and continued until the

present day (the "Relevant Period") and that have caused substantial financial losses to Aspen

and other damages, including, but not limited to, its reputation and goodwill.  Plaintiff hereby

alleges upon personal knowledge as to her own acts and upon information and belief as to all other matters, based upon, *inter alia*, an investigation conducted by her counsel, which included, among other things, the review of publicly available documents filed with the United States Securities and Exchange Commission ("SEC"), press releases and other media reports.

## INTRODUCTION

1.      In recent months, over 100 companies have come under scrutiny for their stock option granting practices. On March 18, 2006, an article appeared in the *Wall Street Journal* (the "*Journal*") entitled, "The Perfect Payday – Some CEOs reap millions by landing stock options when they are most valuable; Luck – or something else?" The *Journal's* analysis focused on financial filings from several high-tech companies and was an extension of recent academic articles which suggested that "backdating [stock options] was widespread, particularly from the start of the tech-stock boom in the 1990s though the Sarbanes-Oxley corporate reform act of 2002."

2.      Backdating at Aspen has unjustly enriched the Company's top executives and directors to the detriment of Aspen and its shareholders. A key purpose of stock options is to give recipients an incentive to improve their employer's performance, including its stock price. Backdating options such that they carry a lower price runs counter to this goal, giving the recipient a "paper profit" right from the start. For example, if a company grants options on May 22, when its stock price is $20, but records the date of issue as April 22, when the stock price was only $15, it would be giving those who were granted options a riskless profit. Thus, manipulating options such that they carried a strike price lower than the trading price of the stock on the date of grant, Aspen insiders profited immediately upon the award of the options without doing anything to improve the Company's business or financial condition – a situation which

2

President George W. Bush recently declared "bad for America": "[O]vercompensating or trying to *backdate things is . . . bad for America*.[1] And there ought to be consequences when people don't tell the truth and are not transparent."

3.       Lynn Turner, the SEC's former Chief Accountant, described undisclosed backdating as follows: "It's like allowing people to place bets on a horse race after the horses have crossed the finish line." Arthur Levitt, former Chairman of the SEC, described backdating as stealing: "It is ripping off shareholders in an unconscionable way" and "represents the ultimate in greed."

4.       Moreover, Harvey Pitt, former Chairman of the SEC, recently opined that "backdating" plainly violates both the federal securities laws and state corporate fiduciary laws, stating:

> What's so terrible about backdating options grants?
>
> For one thing, it likely renders a company's proxy materials false and misleading. Proxies typically indicate that options are granted at fair market value. But if the grant is backdated, the options value isn't fair – at least not from the vantage point of the company and its shareholders.
>
> For another, backdating means a corporate document used to permit access to corporate assets has been falsified, a violation of the Foreign Corrupt Practices Act. Moreover, if backdating occurs without the compensation committee's knowledge, illegal insider trading may also have occurred.
>
> Securities law violations are not the only potential problems with backdating options grants. Backdating may violate the Internal Revenue Code, and companies may not be able to deduct the options payments. On the state level, backdating could involve a breach of fiduciary duty, a waste of corporate assets and even a usurpation of a corporate opportunity.
>
> \*       \*       \*
>
> More fundamentally, the financial statements of a company that has engaged in backdating may require restatement. The options may not be deductible, and the

---

[1] All emphasis is added throughout, unless otherwise noted.

expenses, as well as the various periods to which they may have been allocated, may also be incorrect. . . .

More to the point, what does this kind of conduct say about those who do it and those who allow it to occur (either wittingly or unwittingly)?

Those who backdate options grants violate federal and state law. And those on whose watch this conduct occurs are also potentially liable: If they knew about the backdating, they're participants in fraudulent and unlawful conduct. If they didn't know about the backdating, the question will be: Should they have done more to discover it?

Harvey Pitt, *The Next Big Scandal*, Forbes.com, May 26, 2006. Chairman Pitt also opined that:

Options backdating calls a company's internal controls into question. Many discussions of backdating start with the observation that backdating is not, per se, illegal. That is wrong. Options backdating frequently involves falsification of records used to gain access to corporate assets. . . . If corporate directors were complicit in these efforts, state law fiduciary obligations are violated. Backdating is not only illegal and unethical, it points to a lack of integrity in a company's internal controls.

Harvey Pitt, *Lessons of the stock option scandal*, Fin. Times, June 2, 2006.

5.    United States Senator Charles Grassley agrees. On September 6, 2006, the United States Senate Committee on Finance held a hearing, "Executive Compensation: Backdating to the Future/Oversight of current issues regarding executive compensation including backdating of stock options; and tax treatment of executive compensation, retirement and benefits." Chairman Grassley, in his opening statement, stated: "*[Options backdating] is behavior that, to put it bluntly, is disgusting and repulsive. It is behavior that ignores the concept of an 'honest day's work for an honest day's pay' and replaces it with a phrase that we hear all too often today, 'I'm going to get mine*.' . . . [S]hareholders and rank-and-file employees were ripped off by senior executives who rigged stock option programs – through a process called 'back-dating' – to further enrich themselves. And as we have found far too often in corporation scandals of recent

years, boards of directors were either asleep at the switch, or in some cases, willing accomplices themselves. . . ."

6.      Moreover, as the *Journal* recently explained on December 12, 2006, in an article entitled "How Backdating Helped Executives Cut Their Taxes," many corporate insiders have manipulated stock option grant dates *for the additional purpose of cheating on their income taxes*. Far more often than not, grant recipients immediately sell the shares they buy when they exercise options, and are required to pay ordinary income tax, as well as payroll taxes, on the difference between the stock's value on the date the option was exercised and the options' strike price. The highest federal marginal income tax rate is 35%. However, those insiders who hold shares for at least a year will pay a much lower capital gains tax – currently 15% – on any profit between the time they exercise and when they eventually dispose of the shares. This substantially lower tax rate provides an obvious incentive to exercise options at a relative low point in the stock price. As the *Journal* explained:

> Consider an executive who holds options on 100,000 shares with a strike price of $10. If he exercises and sells when the price is $20, he realizes $1 million in income and must pay $350,000 in income taxes.
>
> If he instead can claim an exercise price of $16, he lowers his income tax to $210,000. If he then sells a year later and the stock is at the same price of $20, he pays $60,000 in capital-gains levies, for a total tax bite of $270,000. *In other words, he has the same $1 million gain but saves $80,000 in taxes*.

7.      Defendants' conduct complained of herein is just the type of illegal backdating described above, which federal prosecutors and the SEC has been investigating intensely over the past year. Throughout the Relevant Period, as recently admitted by the Company, Defendants were granted hundreds of thousands of backdated or otherwise manipulated options to purchase Aspen stock, in direct violation of the terms of Aspen's shareholder-approved stock option plans.

Defendants' manipulation of options also constitutes breaches of their fiduciary duties of care, loyalty, and good faith to Aspen.

8.     As a result of Defendants' unlawful stock option backdating scheme, the Company has been forced to announce a planned restatement of its historical financial results and has been exposed to a costly internal investigation.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1331 in that plaintiff's claims arise in part under the Constitution and laws of the United States, including SOX. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a). This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

10.    Venue is proper in this jurisdiction pursuant to 28 U.S.C. §1391(b) insofar as a substantial part of the events or omissions giving rise to the claim occurred within this judicial district.

## THE PARTIES

11.    Plaintiff Deborah A. Risberg ("Plaintiff") acquired 300 shares of Aspen common stock on October 5, 1998. Plaintiff sold 50 of those shares on August 30, 2000 and she never purchased any additional Aspen shares. Thus, Plaintiff currently owns 250 shares of Aspen common stock. Plaintiff is a citizen of Georgia.

12.    Nominal Defendant Aspen is a corporation organized and existing under the laws of Delaware, with its headquarters located in this District at Ten Canal Park, Cambridge, Massachusetts 02141-2201.

13.     Defendant Joan C. McArdle ("McArdle") has served on Aspen's board of directors (the "Board") since 1994.  Defendant McArdle also serves on the Board's Audit Committee (the "Audit Committee") as well as the Nominating and Corporate Governance Committee.  McArdle has also served two terms of duty as a member of the Compensation Committee (the "Compensation Committee"); first from 1996-1999, and then again in 2002. According to the Company's public filings, McArdle authorized the backdated and/or otherwise manipulated option grants challenged herein.  McArdle also falsely stated that options were priced at fair market value on the date of the grant in numerous Aspen financial filings, including the Company's Annual Proxy Statements and its Annual Reports on Form 10-K.  Defendant McArdle knew, or recklessly failed to know, the below-described adverse non-public information about the business and stock option backdating of Aspen, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to her in connection therewith.  As of October 1, 2005, McArdle held 134,298 options to purchase Aspen stock.

14.     Defendant Stephen M. Jennings ("Jennings") has served on the Board since July 2000, and has served as Chairman of the Board since January 2005.  In addition, Defendant Jennings is the Chairman of the Compensation Committee and has served on the Compensation Committee since 2000.  He is also a member of the Nominating and Corporate Governance Committees.  According to the Company's public filings, Jennings authorized the backdated and/or otherwise manipulated option grants challenged herein.  Jennings also falsely stated that options were priced at fair market value on the date of the grant in numerous Aspen financial filings, including the Company's Annual Proxy Statements and its Annual Reports on Form 10-

K.     Defendant Jennings knew, or recklessly failed to know, the below-described adverse non-public information about the business and stock option backdating of Aspen, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. As of October 1, 2005, Jennings held 102,523 options to purchase Aspen stock.

15.     Defendant Donald P. Casey ("Casey") has served on the Board since April 2004. Defendant Casey has also served on the Audit Committee, the Compensation Committee, and the Nominating and Corporate Governance Committee since April 2004.     According to the Company's public filings, Casey authorized the backdated and/or otherwise manipulated option grants challenged herein.   Casey also falsely stated that options were priced at fair market value on the date of the grant in numerous Aspen financial filings, including the Company's Annual Proxy Statements and its Annual Reports on Form 10-K.   Defendant Casey knew, or recklessly failed to know, the below-described adverse non-public information about the business and stock option backdating of Aspen, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith.  As of October 1, 2005, Casey held 19,000 options to purchase Aspen stock.

16.     Defendant Mark E. Fusco ("Fusco") has served on the Board since December 2003, and has served as the Company's President and Chief Executive Officer ("CEO") since January 2005.   Defendant Fusco was a member of the Compensation and Nominating and Corporate Governance Committees in 2004, and has served on the Compensation Committee

8

since April 2004. According to the Company's public filings, Fusco authorized the backdated and/or otherwise manipulated option grants challenged herein. Fusco also falsely stated that options were priced at fair market value on the date of the grant in numerous Aspen financial filings, including the Company's Annual Proxy Statements and its Annual Reports on Form 10-K. Defendant Fusco knew, or recklessly failed to know, the below-described adverse non-public information about the business and stock option backdating of Aspen, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. As of October 1, 2005, Fusco held 589,000 options to purchase Aspen stock.

17.     Defendant Gary E. Haroian ("Haroian") has served on the Board since December 2003. He also has served on the Audit and Nominating and Corporate Governance Committees since that time. Defendant Haroian has been determined to be an "audit committee financial expert," as defined in Item 401(h) of Regulation S-K. Defendant Haroian knew, or recklessly failed to know, the below-described adverse non-public information about the business and stock option backdating of Aspen, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. As of October 1, 2005, Haroian held 23,000 options to purchase Aspen stock.

18.     Defendant Michael Pehl ("Pehl") has served on the Board since August 2003. Defendant Pehl knew, or recklessly failed to know, the below-described adverse non-public information about the business and stock option backdating of Aspen, as well as its finances, via

access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. As of October 1, 2005, Pehl held 1,527,003 options to purchase Aspen stock.

19.    Defendant Douglas A. Kingsley ("Kingsley") served on the Board from August 2003 through January 2006. Defendant Kingsley knew, or recklessly failed to know, the below-described adverse non-public information about the business and stock option backdating of Aspen, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith.    As of October 1, 2005, Kingsley held 4,432,790 options to purchase Aspen stock.

20.    Defendant Stephen L. Brown ("S. Brown") served on the Board from July 2000 until 2003.    During that time, he served on the Audit, Compensation, and Nominating and Corporate Governance Committees.    According to the Company's public filings, S. Brown authorized the backdated and/or otherwise manipulated option grants challenged herein.    S. Brown also falsely stated that options were priced at fair market value on the date of the grant in numerous Aspen financial filings, including the Company's Annual Proxy Statements and its Annual Reports on Form 10-K.    Defendant S. Brown knew, or recklessly failed to know, the below-described adverse non-public information about the business and stock option backdating of Aspen, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to

10

him in connection therewith. As of October 1, 2005, S. Brown held 53,523 options to purchase Aspen stock.

21.    Defendant Gresham T. Brebach, Jr. (Brebach") served on the Board from 1995 until 2003. During that time, he served on the board's Audit and Compensation Committees. According to the Company's public filings, Brebach authorized the backdated and/or otherwise manipulated option grants challenged herein.  Brebach also falsely stated that options were priced at fair market value on the date of the grant in numerous Aspen financial filings, including the Company's Annual Proxy Statements and its Annual Reports on Form 10-K.   Defendant Brebach knew, or recklessly failed to know, the below-described adverse non-public information about the business and stock option backdating of Aspen, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. As of October 1, 2005, Brebach held 102,523 options to purchase Aspen stock.

22.    Defendant Douglas R. Brown ("D. Brown") served on the Board from 1986 until 2002. During that time, he served on the Audit, Compensation, and Nominating and Corporate Governance Committees. According to the Company's public filings, D. Brown authorized the backdated and/or otherwise manipulated option grants challenged herein. D. Brown also falsely stated that options were priced at fair market value on the date of the grant in numerous Aspen financial filings, including the Company's Annual Proxy Statements and its Annual Reports on Form 10-K. Defendant D. Brown knew, or recklessly failed to know, the below-described adverse non-public information about the business and stock option backdating of Aspen, as well as its finances, via access to internal corporate documents, conversations and connections with

other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. As of October 1, 2005, D. Brown held 102,523 options to purchase Aspen stock.

23.     Defendant Charles F. Kane ("Kane") was Aspen's Senior Vice President, Finance and Chief Financial Officer ("CFO") from July 2003 until September 2006. Kane knew, or recklessly failed to know, the below-described adverse non-public information about the business and stock option backdating of Aspen, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. Since 1997, Kane has received at least 189,216 backdated or otherwise manipulated options from Aspen.[2]

24.     Defendant Manolis E. Kotzabasakis ("Kotzabasakis") has been with Aspen since at least 1997 and is currently the Company's Senior Vice President, Sales and Business Development. Kotzabasakis knew, or recklessly failed to know, the below-described adverse non-public information about the business and stock option backdating of Aspen, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to him in connection

---

[2] These option numbers, and others included in this complaint, are based only on Defendants' publicly reported statements regarding option grants. Plaintiff believes that discovery may reveal that Aspen has granted unreported stock options to other potential executive officer defendants, and that the options granted to the named Defendants may actually be larger than reported.

therewith. Since 1997, Kotzabasakis has received at least 37,547 backdated or otherwise manipulated options from Aspen.

25.     Defendant C. Steven Pringle ("Pringle") has been with Aspen since at least July 2002 and is currently the Company's Senior Vice President, Global Services.  Pringle knew, or recklessly failed to know, the below-described adverse non-public information about the business and stock option backdating of Aspen, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. Since 1997, Pringle has received at least 335,727 backdated or otherwise manipulated options from Aspen.

26.     Defendant David McQuillin ("McQuillin") joined Aspen in 1997 and was the Company's President and CEO from October 2002 until January 2005.  He also served on the Board from October 2002 until January 2005.  McQuillin knew, or recklessly failed to know, the below-described adverse non-public information about the business and stock option backdating of Aspen, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. Since 1997, McQuillin has received at least 1,880,000 backdated or otherwise manipulated options from Aspen.

27.     Defendant Lawrence B. Evans ("Evans") was Aspen's principal founder and served on the Board from 1981 until 2004.  Evans was the Chairman of the Board from 1984 until 2004, the Company's President from 1984 through 2001, and its CEO from 1984 through 2002.  Evans knew, or recklessly failed to know, the below-described adverse non-public

information about the business and stock option backdating of Aspen, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. Since 1997, Evans has received at least 251,652 backdated or otherwise manipulated options from Aspen.

28.     Defendant Stephen J. Doyle ("Doyle") joined Aspen as early as 1996 and was the Company's General Counsel and Secretary from May 2002 until July 2005. Doyle knew, or recklessly failed to know, the below-described adverse non-public information about the business and stock option backdating of Aspen, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. Since 1997, Doyle has received at least 290,835 backdated or otherwise manipulated options from Aspen.

29.     Defendant Lisa W. Zappala ("Zappala") joined Aspen as early as 1995 and was the Company's Senior Vice President, Finance in 2003.   She also served as the Company's Chief Financial Officer ("CFO") from September 1998 through June 2003. Zappala knew, or recklessly failed to know, the below-described adverse non-public information about the business and stock option backdating of Aspen, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. Since 1997, Zappala has received at least 45,704 backdated or otherwise manipulated options from Aspen.

30.     Defendant Mary A. Palermo ("Palermo") joined Aspen in 1987. Palermo served as the Company's Co-Chief Operating Officer from January 2001 until 2003. Palermo knew, or recklessly failed to know, the below-described adverse non-public information about the business and stock option backdating of Aspen, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. Since 1997, Palermo has received at least 164,726 backdated or otherwise manipulated options from Aspen.

31.     McArdle, Casey, Fusco, Haroian, Jennings, Pehl, Kingsley, S. Brown, Brebach and D. Brown are sometimes referred to herein as the "Director Defendants."

32.     Kane, Kotsabaskis, Pringle, McQuillin, Evans, Doyle, Zappal, and Palermo are sometimes referred to herein as the "Officer Defendants."

33.     Collectively, Defendants McArdle, Kingsley, Casey, Fusco, Haroian, Jennings, Pehl, S. Brown, Brebach, D. Brown, Kane, Kotzabaskis, Pringle, McQuillin, Evans, Doyle, Zappala, and Palermo are referred to herein as "Defendants."

## DEFENDANTS' DUTIES

34.     By reason of their positions as directors, and with regard to some, officers, and/or fiduciaries of Aspen, Defendants owed Aspen and its shareholders fiduciary obligations of trust, loyalty, due care, good faith, and fair dealing and were and are required to use their utmost ability to control Aspen in a fair, just, honest and equitable manner.

35.     Each director and officer of the Company owes to Aspen and its shareholders the fiduciary duty to exercise due care and good faith and diligence in the administration of the Company's affairs, and the highest obligations of fair dealing. In addition, as directors of a

15

publicly held company, the Director Defendants had a duty to insure that the Company had sufficient internal controls to ensure that it promptly disseminated accurate and truthful information with regard to the Company's financial results, and that the Company had adequate corporate checks to protect against the unlawful back-dating of options and the improper accounting for those options, as described below.

36.    To discharge their duties, Defendants were required to exercise reasonable and prudent supervision over management, and the Company's policies, practices and financial controls. By virtue of such duties, Defendants were required to, among other things:

(a)    Ensure that an adequate system of internal controls was in place such that Aspen complied with applicable laws and financial results were reported accurately;

(b)    Ensure that the Company had adequate corporate checks in place to ensure the Company was in compliance with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)    Ensure that management was conducting the affairs of the Company in an efficient, business-like manner to make it possible to provide the highest quality performance of its business, and to maximize the value of the Company's stock; and

(d)    Remain informed as to how Aspen conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws.

37.     Aspen's Audit Committee Charter provides that the purpose of the Audit
Committee is to assist the Board in connection with its oversight of: (i) *the integrity of the
Company's financial statements*; (ii) the Company's compliance with legal and regulatory
requirements; (iii) the independent auditor's qualifications and independence; and (iv) the
performance of the Company's internal audit function and independent auditors.  The Audit
Committee Charter further provides, in relevant part:

### Authority and Responsibilities

The Audit Committee shall discharge its responsibilities, and shall assess the
information provided by the Company's management and the independent auditor,
in accordance with its business judgment. Management is responsible for the
preparation, presentation, and integrity of the Company's financial statements and
for the appropriateness of the accounting principles and reporting policies that are
used by the Company. The independent auditors are responsible for auditing the
Company's financial statements and for reviewing the Company's unaudited
interim financial statements. The authority and responsibilities set forth in this
Charter do not reflect or create any duty or obligation of the Audit Committee to
plan or conduct any audit, to determine or certify that the Company's financial
statements are complete, accurate, fairly presented, or in accordance with
generally accepted accounting principles or applicable law, or to guarantee the
independent auditor's report.

### Review of Audited Financial Statements

Discussion of Audited Financial Statements. *The Audit Committee shall review
and discuss with the Company's management and independent auditor the
Company's audited financial statements*, including the matters about which
Statement on Auditing Standards No. 61 (Codification of Statements on Auditing
Standards, AU §380) requires discussion.

Recommendation to Board Regarding Financial Statements. *The Audit
Committee shall consider whether it will recommend to the Board of Directors
that the Company's audited financial statements be included in the Company's
Annual Report on Form 10-K.*

Audit Committee Report. The Audit Committee shall prepare an annual
committee report for inclusion where necessary in the proxy statement of the
Company relating to its annual meeting of security holders.

### Controls and Procedures

Oversight. ***The Audit Committee shall coordinate the Board of Directors'
oversight of the Company's internal accounting controls for financial
reporting, the Company's disclosure controls and procedures and the
Company's code of conduct. The Audit Committee shall receive and review the
reports of the CEO and CFO required by Section 302 of the Sarbanes-Oxley Act
of 2002*** (and the applicable rules thereunder) and Rule 13a-14 of the Exchange
Act.

Related-Party Transactions. The Audit Committee shall review all related party
transactions on an ongoing basis, and all such transactions must be approved by
the Audit Committee.

**Procedures and Administration**

Reports to Board. The Audit Committee shall report regularly to the Board of
Directors.

Investigations. ***The Audit Committee shall have the authority to conduct or
authorize investigations into any matters within the scope of its responsibilities
as it shall deem appropriate, including the authority to request any officer,
employee or advisor of the Company to meet with the Audit Committee or any
advisors engaged by the Audit Committee.***

38.     According to Aspen's Compensation Committee Charter, the purpose of the

Compensation Committee is to discharge the responsibilities of the Board of Directors relating to

compensation of the Company's executive officers.   The Compensation Committee Charter

further provides, in relevant part:

**Compensation Matters**

Executive Officer Compensation. The Compensation Committee shall review
and approve, or recommend for approval by a majority of the independent
directors of the Board of Directors, executive officer (including the
Company's Chief Executive Officer (the "CEO")) compensation, including
salary, bonus and incentive compensation levels; deferred compensation;
executive perquisites; equity compensation (including awards to induce
employment); severance arrangements; change-in-control benefits and other
forms of executive officer compensation. The Compensation Committee or
the independent directors of the Board of Directors, as the case may be, shall
meet without the presence of executive officers when approving CEO
compensation but may, in its or their discretion, invite the CEO to be present
during approval of other executive officer compensation.

18

Plan Recommendations and Approvals. The Compensation Committee shall periodically review and make recommendations to the Board of Directors with respect to incentive-compensation plans and equity-based plans. *In addition to any recommendation provided by the Compensation Committee to the full Board of Directors, the Compensation Committee shall approve, or recommend for approval by a majority of the independent directors of the Board of Directors, any tax-qualified, non-discriminatory employee benefit plans (and any parallel nonqualified plans) for which stockholder approval is not sought and pursuant to which options or stock may be acquired by officers, directors, employees or consultants of the Company.*

Incentive Plan Administration. *The Compensation Committee shall exercise all rights, authority and functions of the Board of Directors under all of the Company's stock option, stock incentive, employee stock purchase and other equity-based plans, including without limitation, the authority to interpret the terms thereof, to grant options thereunder and to make stock awards thereunder*; provided, however, that, except as otherwise expressly authorized to do so by a plan or resolution of the Board of Directors, the Compensation Committee shall not be authorized to amend any such plan. To the extent permitted by applicable law and the provisions of a given equity-based plan, and consistent with the requirements of applicable law and such equity-based plan, the Compensation Committee may delegate to one or more executive officers of the Company the power to grant options or other stock awards pursuant to such equity-based plan to employees of the Company or any subsidiary of the Company who are not directors or executive officers of the Company.

Director Compensation. The Compensation Committee shall periodically review and make recommendations to the Board of Directors with respect to director compensation.

Compensation Committee Report on Executive Compensation. The Compensation Committee shall prepare for inclusion where necessary in a proxy or information statement of the Company relating to an annual meeting of security holders at which directors are to be elected (or special meeting or written consents in lieu of such meeting), the report described in Item 402(k) of Regulation S-K.

Compensation Committee Report on Repricing of Options/SARs. If during the last fiscal year of the Company (while the Company was a reporting company pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder (the "Exchange Act")) any adjustment or amendment was made to the exercise price of any stock option or stock appreciation right previously awarded to a "named executive officer" (as such term is defined from time to time in Item 402(a)(3) of Regulation S-

K), the Compensation Committee shall furnish the report required by Item 402(i) of Regulation S-K.

**Procedures and Administration**

<u>Reports to Board</u>. The Compensation Committee shall report regularly to the Board of Directors.

<u>Investigations</u>. *The Compensation Committee shall have the authority to conduct or authorize investigations into any matters within the scope of its responsibilities as it shall deem appropriate, including the authority to request any officer, employee or advisor of the Company to meet with the Compensation Committee or any advisors engaged by the Compensation Committee.*

39. Defendants' conduct complained of herein involves a reckless and/or knowing violation of their obligations as directors and officers of Aspen, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that Defendants were aware or should have been aware posed a risk of serious injury to the Company.

40. Defendants breached their fiduciary duties by failing to implement an adequate system of internal controls, which failure caused the Company to misrepresent its financial condition and allowed the unlawful back-dating of options.

41. During all times relevant hereto, Defendants breached their fiduciary duties to Aspen's shareholders by failing to prevent financial statements from being issued that misrepresented to the investing public, including shareholders of Aspen, the Company's actual financial results.

42. Moreover, these actions have irreparably damaged Aspen's corporate image and goodwill. For at least the foreseeable future, Aspen will suffer from what is known as the "liar's discount," a term applied to the stocks of companies implicated in illegal behavior and that

misled the investing public, such that Aspen's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## BACKGROUND

43.     Stock options give recipients the chance to purchase a corporation's common stock at a certain price, which is usually referred to as the "exercise price" or the "strike price." Generally, and for reasons largely related to applicable IRS rules (as discussed below), option exercise prices are usually set on the date of the grant and they are established based on the corporation's closing stock price on the date of the grant.

44.     Generally, the theory is that the recipient of any option grant is assuming the risk in receiving the grant; that is, if the corporation's stock price declines after the date of the grant, those options (at least in the short term) do not have any true economic value because the recipient of the grant can purchase the corporation's common stock in the open market at a price that is lower than the strike price on the option.  Sometimes, these options are (colloquially) said to be "underwater" because they are not "in-the-money" and thus, there is no rationale economic reason to exercise the option if the corporation's stock price declines after the date of the grant.

45.     Conversely, if a corporation's stock price increases after the date of a grant, the recipient of the grant has received a valuable economic benefit - the recipient can then exercise the option, which allows him/her to purchase stock below market price which he/she can then sell into the market for a profit.

46.     In 2005, the SEC began investigating the stock option granting practices of numerous companies.  As reported by the *Journal* on March 18, 2006, the SEC's "look at

21

options timing was largely prompted by academic research that examined thousands of companies and found odd patterns of stock movement around the dates of the grants."

47.     The premise of the academic research was that mere chance could not have accounted for many of the fortuitous reported grant dates and a pattern emerged - at certain companies, executives, consistently, over a multi-year period, received options that were purportedly dated at or near historical low trading prices of their companies' stock, but just prior to material increases in the stock price.  The academics' conclusion, which was based on a sophisticated statistical analysis, was that option grant dates were manipulated (i.e., backdated) at many companies they examined.

48.     Generally, the theory is that these improper backdating practices allowed corporate insiders to reap unlawful windfall profits when the options were exercised.  It stands to reason that if an executive was allowed to pick a grant date (instead of sticking with whatever date the options were actually granted), he/she could pick a date when the corporation's stock price was low, thereby earning "extra," but illicit profits.

## DEFENDANTS' UNLAWFUL BACKDATING SCHEME

49.     Between at least 1997 and 2006, Aspen, through the actions of the Board and the Compensation Committee, granted backdated stock options for the purchase of millions of shares of the Company's common stock to Defendants, who were highly placed executives with the Company.

50.     In its public filings with the SEC, including in the Company's Annual Proxy Statements seeking shareholder approval for the stock options plans, Defendants contracted and represented that the exercise price of all of the stock options granted would be fixed based on the fair market value of the Company's common stock on the date of the grant.

### Contracts and Disclosures Regarding the Stock Option Plans

51.    In 1995, Aspen created a series of shareholder-approved stock option plans. The first, known as The Aspen Technology, Inc. 1995 Employee Stock Purchase Plan (the "1995 Plan") was created to "encourage ownership of Stock by employees of the Company and to provide additional incentive for the employees to promote the success of the business of the Company."

52.    Amended in 2003, the 1995 Plan provides in relevant part:

> The Plan shall be administered by the Committee, which shall determine from time to time whether to grant Options under the Plan, shall specify which dates shall be Grant Dates and Exercise Dates, shall determine the fair market value of the Stock, and shall fix the maximum percentage of each Optionee's Compensation which may be withheld for the purpose of purchasing shares of Stock; PROVIDED, that, the maximum percentage shall not exceed five percent. The Committee shall have authority to interpret the Plan, to prescribe, amend and rescind rules and regulations relating to the Plan, to determine the terms of Options granted under the Plan, and to make all other determinations necessary or advisable for the administration of the Plan.

53.    "Committee" is defined in the Plan as "a committee of the board of directors of the Company composed exclusively of disinterested directors."

54.    The 1995 Plan also provides that "[t]he purchase price of shares of Stock shall be 85% of the lesser of (a) the Market Value of the shares as of the Grant Date, or (b) the Market Value of the shares as of the Exercise Date, or such greater percentage as may be set by the Committee from time to time."

55.    During the Relevant Period, Aspen also had a shareholder-approved stock option plan for Directors, known as the 1995 Directors Stock Option Plan (the "1995 Directors Plan"). The 1995 Directors Plan was created to "encourage ownership of the Stock by non-employee

directors of the Company and to provide additional incentive for them to promote the success of the Company's business."

56.    The 1995 Director's Plan provided for option grants to non-employee directors as follows:

> FIRST GRANTS TO CERTAIN DIRECTORS. Each individual who was not, within the 12 months preceding his or her first election to the Board of Directors, either an officer or employee of the Company or any subsidiary of the Company and who is serving as a director immediately after the 1995 Annual Meeting of Stockholders or who is first elected to the Board of Directors during the term of the Plan (whether elected at an annual or special stockholders' meeting or by action of the Board of Directors) shall be granted, on the date of the 1995 Annual Meeting or such later election an Option to purchase 12,000 shares of Stock. Each Option shall (i) have an exercise price equal to 100% of the Fair Market Value of the Stock on the Grant Date, and (ii) become exercisable in 12 quarterly installments, beginning with the last day of the calendar quarter following the Grant Date, but only if the Optionee remains a director of the Company on the respective dates. The Option Period shall be ten years from the Grant Date.

> SUBSEQUENT GRANTS TO CERTAIN DIRECTORS. Each individual who continues as a non-employee director following any Annual Meeting of Stockholders of the Company shall be granted, on the date of that Annual Meeting of Stockholders, an Option to purchase 4,000 shares of Stock. Each Option shall (i) have an Exercise Price equal to 100% of the Fair Market Value of the Stock on the Grant Date and(ii) become exercisable in four quarterly installments, beginning with the third anniversary of the Grant Date, but only if the Optionee remains a director of the Company on the respective dates. The Option Period shall be ten years from the Grant Date.

57.    At some point after the adoption of the 1995 Directors Plan, it was amended to increase the amount of the initial grants to directors from 12,000 to 24,000 options, and to increase subsequent annual grants from 4,000 to 8,000 options.

58.    In 1995, Aspen also created a stock option incentive plan known simply as the 1995 Stock Option Plan ("1995 Incentive Plan").  With the stated purpose of "encourage[ing] ownership of the Stock by key employees and key advisors of the Company and its Related

24

Corporations and to provide additional incentive for them to promote the success of the

Company's business," this Plan was to be administered according to the following guidelines:

> The Plan shall be administered by the Committee. Subject to the
> provisions of the Plan, the Committee shall have complete authority, in its
> discretion, to make the following determinations with respect to each
> Option to be granted by the Company: (a) the key employee or key
> advisor to receive the Option; (b) the time of granting the Option; (c) the
> number of shares subject thereto; (d) the Option Price; (e) the Option
> period; and (f) if the Optionee is an employee, whether the Option is an
> Incentive Option. In making such determinations, the Committee may take
> into account the nature of the services rendered by the key employees and
> key advisors, their present and potential contributions to the success of the
> Company and its Related Corporations, and such other factors as the
> Committee in its discretion shall deem relevant. Subject to the provisions
> of the Plan, the Committee shall also have complete authority to interpret
> the Plan, to prescribe, amend and rescind rules and regulations relating to
> it, to determine the terms and provisions of the respective Option
> Agreements (which need not be identical), and to make all other
> determinations necessary or advisable for the administration of the Plan.
> The Committee's determinations on the matters referred to in this Section
> 5 shall be conclusive.

59.     The 1995 Incentive Plan defined "Committee" as "[t]he Compensation

Committee of the Company's Board of Directors."

60.     ***Regarding option pricing, the Plan provided, "[t]he Option Price under each
Incentive Option shall be not less than 100% of the Fair Market Value of the Stock on the
Grant Date except that the Option Price under an Incentive Option granted to a Major
Shareholder must be not less than 110% of the Fair Market Value."***

61.     The Company also has three additional stock option plans to benefit the

Company's employees: the 1996 Special Stock Option Plan; the 1998 Employee Stock Purchase

Plan, and the 2001 Stock Option Plan. Each of these plans were also administered by the

Compensation Committee and the strike price there under was purportedly set at the fair market

value of Aspen stock on the date of the grant.

**Executive Officers' Receipt of Backdated Stock Options**

62.     Employing a widely accepted analytical model for detecting backdated options –
the price action of an issuer's common stock 20 days before and 20 days after the date of grant –
a review of the stock option grants at Aspen during the relevant period shows that the stock
option grants were dated near or on the very day that Aspen stock hit its low price for the month,
or in advance of sharp stock price increases.

63.     This astonishing multi-year pattern of stock option grants on dates with highly
favorable exercise prices – at or near a periodic law, or preceding a sharp increase in the share
price – indicates that the purported grant dates of stock options were not the actual dates on
which the option grants were made.  Rather, the pattern indicates that the grants were repeatedly
backdated to dates with exceedingly low stock prices.  Indeed, the exercise price of almost every
grant to defendants in the relevant period was below the weighted average price of the stock in
the corresponding fiscal year.  As discussed herein, Defendants have already tacitly admitted the
truth of these allegations.

64.     As demonstrated below, year after year, Aspen stock options were granted at
different times of the year with the only consistency being that the grants were at or near a
periodic low or preceded a run-up in the share price.

65.     On September 11, 1997, the Compensation Committee purportedly awarded
Defendants Evans, Palermo, and three other executives nearly 25,000 Aspen stock options.  On
September 11, 1997, Aspen stock closed at $31.12, near the bottom of a sharp drop in the price
of Aspen common stock, and preceding a sharp price increase.  Aspen's stock price rose to
$35.12, or nearly 13%, within 20 days of this purported grant:

| Aspen Stock Price 20 Days Prior to Option Grant | Aspen Stock Price On September 11, 1997 | Aspen Stock Price 20 Days After Option Grant |
|---|---|---|

| $36.13 | $31.12 | $35.12 |
|---|---|---|

The exercise price for this grant was the lowest closing price of Aspen common stock for the month of September 1997.

66.    On December 19, 1997, the Compensation Committee purportedly awarded Defendants Evans, McQuillin, and two other executives 138,000 Aspen stock options.    On December 19, 1997, Aspen stock closed at $29.25, near the bottom of a sharp drop in the price of Aspen common stock.    Aspen's stock price rose to $31.50, or nearly 8%, within 20 days of this purported grant:

| Aspen Stock Price 20 Days Prior to Option Grant | Aspen Stock Price On Grant Date: December 19, 1997 | Aspen Stock Price 20 Days After Option Grant |
|---|---|---|
| $38.12 | $29.25 | $31.50 |

The exercise price for this grant was the lowest closing price of Aspen common stock for the month of December 1997.

67.    On August 4, 1998, the Compensation Committee purportedly awarded Defendants Evans, Palermo, and one other executive 52,000 stock options.  On August 4, 1998, Aspen stock closed at $23.94, near the bottom of a sharp drop in the price of Aspen common stock, and preceding a sharp price increase.  Aspen's stock price rose to $29.00, or more than 21%, within 20 days of the grant date:

| Aspen Stock Price 20 Days Prior to Option Grant | Aspen Stock Price On Grant Date: August 4, 1998 | Aspen Stock Price 20 Days After Option Grant |
|---|---|---|
| $52.75 | $23.94 | $29.00 |

68.    On October 8, 1998, the Compensation Committee purportedly awarded Defendants Evans, Palermo and two other executives 23,250 options. On October 8, 1998, Aspen stock closed at $7.00, near the bottom of a sharp drop in the price of Aspen common stock, and preceding a sharp price increase.  Aspen's stock price rose to $13.81, or 97.3%, within 20 days of the grant date:

| Aspen Stock Price 20 Days Prior to Option Grant | Aspen Stock Price On Grant Date:  October 8, 1998 | Aspen Stock Price 20 Days After Option Grant |
|---|---|---|
| $25.19 | $7.00 | $13.81 |

69.    On January 15, 1999, the Compensation Committee purportedly awarded Defendants Evans, McQuillin, Palermo, and two other executives 280,000 stock options.  On

January 15, 1999, Aspen stock closed at $13.75, preceding a sharp increase.  Aspen's stock price

rose to $15.19, or 10.5%, within 20 days of the grant date:

| Aspen Stock Price 20 Days Prior to Option Grant | Aspen Stock Price On Grant Date: January 15, 1999 | Aspen Stock Price 20 Days After Option Grant |
|---|---|---|
| $14.12 | $13.75 | $15.19 |

70.     On September 1, 1999, the Compensation Committee purportedly awarded

Defendants Evans, McQuillin, Palermo, and two other executives 187,500 options.   On

September 1, 1999, Aspen stock closed at $8.50, near the bottom of a sharp drop in the price of

Aspen common stock, and preceding a sharp price increase.  Aspen's stock price rose to $10.37,

or  22%, within 20 days of the grant date:

| Aspen Stock Price 20 Days Prior to Option Grant | Aspen Stock Price On Grant Date: September 1, 1999 | Aspen Stock Price 20 Days After Option Grant |
|---|---|---|
| $10.37 | $8.50 | $10.37 |

71.     On April 10, 2001, the Compensation Committee purportedly awarded

Defendants Evans, McQuillin, Palermo, Doyle and Zappala 97,500 options.  On April 10, 2001,

Aspen stock closed at $14.05, near the bottom of a sharp drop in the price of Aspen common

stock, and preceding a sharp price increase.  Aspen's stock price rose to $21.06, or 50%, within

20 days of the grant date:

| Aspen Stock Price 20 Days Prior to Option Grant | Aspen Stock Price On Grant Date: April 10, 2001 | Aspen Stock Price 20 Days After Option Grant |
|---|---|---|
| $19.31 | $14.05 | 21.06 |

72.     On August 16, 2002, the Compensation Committee purportedly awarded

Defendants McQullin, Doyle, Evans, Pringle, Zappala and Kotzabaskis 216,659 options.   On

August 16, 2002, Aspen stock closed at $2.98, near the bottom of a sharp drop in the price of Aspen common stock, and preceding a sharp price increase. Aspen's stock price rose to $4.04, or 36%, within 20 days of the grant date:

| Aspen Stock Price 20 Days Prior to Option Grant | Aspen Stock Price On Grant Date: August 16, 2002 | Aspen Stock Price 20 Days After Option Grant |
|---|---|---|
| $3.75 | $2.98 | $4.04 |

73.     On August 15, 2003, the Compensation Committee awarded Defendants McQullin, Pringle, Kane, and Doyle 2,205,886 options. On August 15, 2003, Aspen stock closed at $2.75, near the bottom of a sharp drop in the price of Aspen common stock, and preceding a sharp price increase. Aspen's stock price rose to $3.81, or 38.5%, in the value of Aspen stock within 20 days of the grant date:

| Aspen Stock Price 20 Days Prior to Option Grant | Aspen Stock Price On Grant Date: August 15, 2003 | Aspen Stock Price 20 Days After Option Grant |
|---|---|---|
| $4.11 | $2.75 | $3.81 |

74.     Pricing options at or near the bottom of a stock price valley was apparently a standard practice for Defendants, and is indicative of option backdating. By allowing the Company's stock price to develop over a period of time, and then returning to that period to select the date with the lowest stock price as the option grant date, Defendants ensured themselves healthy gains built-in to the already generous option grants. Of course, this practice also defeated the purported rationale for awarding stock based compensation to officers and directors as incentives, because backdating options already ensures those options will be in-the-money, thus alleviating the incentive to maximize the Company's performance.

75.     Moreover, throughout the Relevant Period, certain Defendants have exercised many of their allegedly backdated stock options, contributing to their ability to realize millions of dollars in profit on Aspen stock they obtained by cashing in under-priced stock options. Due to incomplete SEC reporting records for Defendants, however, Plaintiff has not been able to determine the precise amount of Defendants' insider sales.

76.     The apparent failure of a number of the Defendants to file reports of their stock option grants, exercises, and stock sales on Forms 3, 4, and 5, as required by the SEC, may have contributed to their ability to backdate options, even after the Sarbanes-Oxley Act of 2002 was enacted.

77.     As a result of the backdating of options issued to Defendants, they have been unjustly enriched in the amount of millions of dollars at the expense of the Company. The Company has received and will receive less money from Defendants when they exercise their options at prices substantially lower than they would have if the options had not been backdated.

78.     The practice of backdating stock options not only lined the pockets of Defendants at the direct expense of the Company, which received less money when the options were exercised, but also resulted in the overstatement of the Company's profits at least between 1997 and 2006. This is because options priced below the stock's fair market value when they were awarded brought the recipient an instant paper gain that must be accounted for as additional compensation and treated as an expense to the Company. As a result, the Company has restated its financial statements from at least fiscal year 1997 through fiscal year 2006 to take into account the backdating of options.

### Aspen's Financial Statements

79.    Throughout the Relevant Period, Defendants caused Aspen to issue unqualified quarterly and yearly financial statements on SEC reports 10-Q and 10-K respectively.  In each financial report issued, Defendants claimed, *inter alia*, that: (i) the Company's financial reports were prepared and presented in accord with GAAP and (ii) they had designed and implemented a series of adequate internal controls.  Those reports included:

### The 1997 Form 10-K

80.    Aspen's financial results for the fiscal fourth quarter and year end of 1997, the period ended June 30, 1997, were reported in the Company's Annual Report on Form 10-K filed with the SEC on or about September 29, 1997.  The Annual Report was signed by Defendants Evans, Palermo, Brebach, D. Brown and McArdle.  The 1997 Form 10-K was simultaneously distributed to shareholders and the public.  The 1997 Form 10-K included Aspen's financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, Aspen's compensation expense was materially understated and its net earnings were materially overstated.

### The 1998 Form 10-K

81.    Aspen's financial results for the fiscal fourth quarter and year end of 1998, the period ended June 30, 1998, were reported in the Company's Annual Report on Form 10-K filed with the SEC on or about September 28, 1998.  The Annual Report was signed by Defendants Evans, Zappala, D. Brown and McArdle.  Although the signature block for this report also included Defendant Brebach, it does not appear that he actually signed.

The 1998 Form 10-K was simultaneously distributed to shareholders and the public. The 1998 Form 10-K included Aspen's financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, Aspen's compensation expense was materially understated and its net earnings were materially overstated.

### The 1999 Form 10-K405

82.     Aspen's financial results for the fiscal fourth quarter and year end of 1999, the period ended June 30, 1999, were reported in the Company's Annual Report on Form 10-K405 filed with the SEC on or about September 28, 1999. The Annual Report was signed by Defendants Evans, Zappala, Brebach, D. Brown and McArdle. The 1999 Form 10-K405 was simultaneously distributed to shareholders and the public. The 1999 Form 10-K405 included Aspen's financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, Aspen's compensation expense was materially understated and its net earnings were materially overstated.

### The 2000 Form 10-K405

83.     Aspen's financial results for the fiscal fourth quarter and year end of 2000, the period ended June 30, 2000, were reported in the Company's Annual Report on Form 10-K405 filed with the SEC on or about September 28, 2000. The Annual Report was signed by Defendants Evans, Zappala, D. Brown, Jennings and McArdle. Although the signature block for this report also included Defendants Brebach and S. Brown, it does not appear that they actually signed. The 2000 Form 10-K405 was simultaneously distributed to shareholders and the public. The 2000 Form 10-K405 included Aspen's financial

33

statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, Aspen's compensation expense was materially understated and its net earnings were materially overstated.

**The 2001 Form 10-K405**

84.     Aspen's financial results for the fiscal fourth quarter and year end of 2001, the period ended June 30, 2001, were reported in the Company's Annual Report on Form 10-K405 filed with the SEC on or about September 28, 2001.   The Annual Report was signed by Defendants Evans, Zappala, Brebach, D. Brown, Jennings and McArdle. Although the signature block for this report also included Defendant S. Brown, it does not appear that he actually signed.  The 2001 Form 10-K405 was simultaneously distributed to shareholders and the public.   The 2001 Form 10-K405 included Aspen's financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, Aspen's compensation expense was materially understated and its net earnings were materially overstated.

**The 2002 Form 10-K**

85.     Aspen's financial results for the fiscal fourth quarter and year end of 2002, the period ended June 30, 2002, were reported in the Company's Annual Report on Form 10-K filed with the SEC on or about September 30, 2002.  The Annual Report was signed by Defendants Evans, Zappala, Brebach, D. Brown, S. Brown, Jennings and McArdle.  The 2002 Form 10-K was simultaneously distributed to shareholders and the public.  The 2002 Form 10-K included Aspen's financial statements which were materially false and

misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, Aspen's compensation expense was materially understated and its net earnings were materially overstated.

**The 2003 Form 10-K**

86. Aspen's financial results for the fiscal fourth quarter and year end of 2003, the period ended June 30, 2003, were reported in the Company's Annual Report on Form 10-K filed with the SEC on or about September 29, 2003. The Annual Report was signed by Defendants McQuillin, Kane, Evans, Brebach, D. Brown, S. Brown, Jennings, McArdle, Kingsley and Pehl. The 2003 Form 10-K was simultaneously distributed to shareholders and the public. The 2003 Form 10-K included Aspen's financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, Aspen's compensation expense was materially understated and its net earnings were materially overstated.

**The 2004 Form 10-K**

87. Aspen's financial results for the fiscal fourth quarter and year end of 2004, the period ended June 30, 2004, were reported in the Company's Annual Report on Form 10-K filed with the SEC on or about September 13, 2004. The Annual Report was signed by Defendants McQuillin, Kane, Evans, Casey, Fusco, Haroian, Jennings, McArdle, Kingsley and Pehl. The 2004 Form 10-K was simultaneously distributed to shareholders and the public. The 2004 Form 10-K included Aspen's financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, Aspen's compensation expense was materially understated and its net earnings were materially overstated.

**The 2004 Form 10-K/A**

88.    Aspen's amended financial results for the fiscal fourth quarter and year end of 2004, the period ended June 30, 2004, were reported in the Company's Amended Annual Report on Form 10-K/A filed with the SEC on or about March 15, 2005.  The Amended Annual Report was signed by Defendants Fusco, Kane, Jennings, Casey, Haroian, Kingsley, McArdle and Pehl.  The 2004 Form 10-K/A was simultaneously distributed to shareholders and the public.  The 2004 Form 10-K/A included Aspen's financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, Aspen's compensation expense was materially understated and its net earnings were materially overstated.

**The 2005 Form 10-K**

89.    Aspen's financial results for the fiscal fourth quarter and year end of 2005, the period ended June 30, 2005, were reported in the Company's Annual Report on Form 10-K filed with the SEC on or about September 13, 2005.  The Annual Report was signed by Defendants Fusco, Kane, Jennings, Casey, Haroian, Kingsley, McArdle and Pehl.  The 2005 Form 10-K was simultaneously distributed to shareholders and the public.   The 2005 Form 10-K included Aspen's financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, Aspen's compensation expense was materially understated and its net earnings were materially overstated.

## False CEO and CFO Certifications

90.    In connection with the filing of certain Annual Reports on Form 10-K during the Relevant Period, Defendants McQuillin and Kane filed false Certifications of Chief Executive

Officer and Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to

Section 906 of the Sarbanes-Oxley Act of 2002 (the "Certification").

91.    In each Certification, McQuillin and Kane made certain representations with

respect to the accuracy and truthfulness of the information contained therein.  For example, the

Company's Form 10-K for fiscal year 2003, filed with the SEC and disseminated to shareholders

on September 29, 2003, contained the following Certification made by McQuillin and Kane:

I, David L. McQuillin/Charles F. Kane, certify that:

1.    I have reviewed this annual report on Form 10-K of Aspen
Technology, Inc.;

2.    Based on my knowledge, this report does not contain any untrue
statement of a material fact or omit to state a material fact
necessary to make the statements made, in light of the
circumstances under which such statements were made, not
misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other
financial information included in this report, fairly present in all
material respects the financial condition, results of operations and
cash flows of the registrant as of and for the periods presented in
this report;

4.    The registrant's other certifying officer and I are responsible for
establishing and maintaining disclosure controls and procedures
(as defined in Exchange Act Rules 13a-14 and 15d-14) for the
registrant and we have:

a)  designed such disclosure controls and procedures to ensure that
material information relating to the registrant, including its
consolidated subsidiaries, is made known to us by others
within those entities, particularly during the period in which
this annual report is being prepared;

b)  evaluated the effectiveness of the registrant's disclosure
controls and procedures as of a date within 90 days prior to the
filing date of this annual report (the "Evaluation Date"); and

c)  presented in this annual report our conclusions about the
effectiveness of the disclosure controls and procedures based

on our evaluation as of the Evaluation Date;

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or person's performing the equivalent function):

a)   all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b)   any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

\*          \*          \*          \*          \*          \*

In connection with the Annual Report of Aspen Technology, Inc. (the "Company") on Form 10-K for the period ended June 30, 2003 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), each of the undersigned officers of the Company, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, certifies that to his knowledge:

(1)   The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities and Exchange Act of 1934; and

(2)   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

92.   Despite their many statements to the contrary, as alleged herein, Defendants did not design a system of adequate controls; nor did they ever make any true attempt to do so. Defendants' failure to establish adequate internal controls could not have been the exercise of valid business judgment, and it rendered all of their statements during the relevant period regarding their controls materially false and misleading when issued. Because Defendants made

no true effort in this regard, the Company's financial reporting was inherently unreliable throughout the relevant period.

### False and Misleading Annual Proxy Statements

93.     Defendants caused Aspen to send to shareholders proxy statements in connection with the Company's annual shareholder meetings during the relevant period. Defendants drafted, approved and/or signed Aspen's proxy statements during that period. Between 1997 and 2006, the Individual Defendants prepared and/or reviewed each proxy statement before the statements were filed with the SEC. Defendants knew, or were deliberately reckless in not knowing, that the proxy statements were materially false and misleading.

94.     Throughout the Relevant Period, the Company, with the knowledge, approval and participation of each of the Individual Defendants, for the purpose and with the effect of concealing the improper stock option backdating, disseminated to shareholders and filed with the SEC annual proxy statements that falsely reported the dates of stock option grants and falsely stated that stock options were granted to Defendants *"with an exercise price equal to the fair market value on the date of grant."*

95.     The Aspen proxy statements that were sent to shareholders by the Company and Defendants in connection with annual shareholders' meetings typically concerned the election of directors, the approval and adoption of Aspen's stock option plans, the authorization to reserve shares for future issuance under the stock option plans, and ratification of the selection of Aspen's auditor. Each proxy statement sent to shareholders during this period contained materially false and misleading disclosures or omitted information about Aspen's stock option practices, as detailed below.