UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 07-10354-RGS

DEBORAH A. RISBERG, derivatively on
behalf of ASPEN TECHNOLOGY, INC.

v.

JOAN C. MCARDLE, DOUGLAS A. KINGSLEY, DONALD P. CASEY,
MARK E. FUSCO, GARY E. HAROIAN, STEPHEN M. JENNINGS,
MICHAEL PEHL, STEVEN L. BROWN, GRESHAM T. BREBACH, JR.,
DOUGLAS R. BROWN, CHARLES F. KANE, MANOLIS E. KOTZABASKIS,
C. STEVEN PRINGLE, DAVID MCQUILLIN, LAWRENCE B. EVANS,
STEPHEN J. DOYLE, LISA W. ZAPPALA, and MARY A. PALERMO, and
ASPEN TECHNOLOGY, INC.

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION TO DISMISS THE
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

January 4, 2008

STEARNS, D.J.

This shareholder derivative suit alleges that a majority of the Board of Directors

(Board) of Aspen Technology, Inc. (Aspen), abdicated its fiduciary duty by awarding

backdated stock options to Aspen insiders. Defendants move to dismiss the action

maintaining that: (1) plaintiff Risberg did not make the required pre-suit demand on the

Board or adequately plead "demand futility"; and (2) that an earlier action, Caviness v.

Evans, 229 F.R.D. 354 (D. Mass. 2005), precludes Risberg from relitigating the issue.[1]

Risberg contends that the issue of demand futility remains viable because of changes in

---

[1]The court dismissed an earlier permutation of the action, Rapine v. McCardle - 06-
11879-RGS, on grounds that the judgment in a prior case, In re Aspen Technology, Inc.
Sec. Litig., 04-12375-JLT (Aspen Technology), barred all claims (including Rapine's) that
arose during the period covered by an incorporated settlement agreement.

the composition of Aspen's Board that occurred after judgment entered in Caviness.

Because the court agrees that Risberg was required to make a pre-suit demand on the

Board, the motion to dismiss will be ALLOWED.

## BACKGROUND

Aspen is a Delaware company that develops and markets integrated software and

related services to the chemical processing industry.   In 1995, Aspen created a stock

option incentive plan (Plan) with the stated purpose of "encouraging ownership of its stock

by key employees and key advisors of the Company and its related corporations."   The

Plan was to be administered according to the following guidelines.

> The Plan shall be administered by the [Compensation[2]] Committee.  Subject
> to the provisions of the Plan, the Committee shall have complete authority
> in its discretion, to make the following determinations with respect to each
> Option to be granted by the Company: (a) the key employee or key advisor
> to receive the Option; (b) the time of granting the Option; (c) the number of
> shares subject thereto; (d) the Option Price; (e) the Option period; and (f) if
> the Optionee is an employee, whether the Option is an Incentive Option.  In
> making such determinations, the Committee may take into account the
> nature of the services rendered by the key employees and key advisors,
> their present and potential contributions to the success of the Company and
> its Related Corporations, and such other factors as the Committee in its
> discretion shall deem relevant.   Subject to provisions of the Plan, the
> Committee shall also have complete authority to interpret the Plan, to
> prescribe, amend and rescind rules and regulations relating to it, to
> determine the terms and provisions of the respective Option Agreements
> (which need not be identical), and to make all other determinations
> necessary or advisable for the administration of the Plan.  The Committee's
> determinations on the matters referred to in this Section 5 shall be
> conclusive.

Complaint ¶ 58.   The Plan further provided that "[t]he Option Price under each Incentive

---

[2]The 1995 Incentive Plan defined "Committee" as "[t]he Compensation Committee
of the Company's Board of Directors."

2

Option shall be not less than 100% of the Fair Market Value of the Stock on the Grant Date except that the Option Price under an Incentive Option granted to a Major Shareholder must be not less than 110% of the Fair Market Value."  In other words, the Compensation Committee had no discretion in setting an option's exercise price; rather, the share price on the grant date established the price in all cases.[3]

In her Complaint, Risberg alleges that stock option grants were dated near or on the very day that Aspen stock hit its low price for the month or immediately preceding a sharp increase in the price of Aspen shares.

> Plaintiff has identified numerous such grants, employing a widely accepted analytical model for detecting backdated options – the price action of an issuer's common stock 20 trading days prior to and 20 trading days following the date of grant.  Complaint ¶ 62.  On September 11, 1997, the Company allegedly granted options with an exercise price of $31.12 per share – the lowest closing price of Aspen stock in September 1997. Within 20 trading days of this grant, the Company's stock price rose to $35.12 - a gain of nearly 13%. Id. at ¶ 65.  On December 19, 1997, the Company allegedly granted options with an exercise price of $29.25 per share – the lowest closing price of Aspen stock in December 1997.  Within 20 trading days of this grant, the Company's stock price rose to $31.50 - a gain of nearly 8%. Id. at ¶ 66.  On August 4, 1998, the Company allegedly granted options with an exercise price of $23.94 per share, following a sharp drop in the price of Aspen stock.  Indeed, just 20 trading days earlier, the closing price of Aspen stock was $52.75, or well over twice that of the purported exercise price. Within 20 trading days of this grant, the Company's stock price rose to $29.00 - a gain of over 21%. Id. at ¶ 67.  On October 8, 1998, the Company allegedly granted options with an exercise price of $7.00 per share, following a sharp drop in the price of Aspen stock.  Indeed, just 20 trading days earlier, the closing price of Aspen stock was $25.19, or more than three times that of the purported exercise price.  Within 20 trading days of this

---

[3]The Company has three additional stock option plans benefitting the Company's employees: the 1996 Special Stock Option Plan; the 1998 Employee Stock Purchase Plan; and the 2001 Stock Option Plan.  Each of these plans was also administered by the Compensation Committee and the strike price under each plan was defined as the fair market value of Aspen stock on the date of the grant.

grant, the Company's stock price rose to $13.81 – a gain of over 97%. Id. at ¶ 68. On January 15, 1999, the Company allegedly granted options with an exercise price of $13.75. Within 20 trading days of this grant, the stock price rose to $15.19 – a gain of over 10%. Id. at ¶ 69. On September 1, 1999, the Company allegedly granted options with an exercise price of $8.50 per share. Within 20 trading days of this grant, the stock price rose to $10.37 – a gain of 22%. Id. at ¶ 70. On April 10, 2001, the Company allegedly granted options with an exercise price of $14.05 per share, following a sharp drop in the price of Aspen stock. Indeed, only 20 trading days earlier, the closing price of Aspen stock had been $19.31, or over 37% higher. Within 20 trading days of this grant, the stock price rose to $21.06 – a gain of 50%. Id. at ¶ 71. On August 16, 2002, the Company allegedly granted options with an exercise price of $2.98, following a sharp drop in the price of Aspen stock. Indeed, only 20 trading days earlier, the closing price of Aspen stock had been $3.75, or nearly 26% higher. Within 20 trading days of this grant, the stock price rose to $4.04 – a gain of 36%. Id. at ¶ 72. On August 15, 2003, the Company allegedly granted options with an exercise price of $2.75, following a sharp drop in the price of Aspen stock. Indeed, only 20 trading days earlier, the closing price of Aspen stock had been $4.11, or over 49% higher. Within 20 trading days of this grant, the stock price rose to $3.81 – a gain of over 38%. Id. at ¶ 73.

Opposition Memorandum, at 4-5 n.7.

On September 29, 2006, Aspen filed its Annual Form 10-K Report for the fiscal year 2006. Aspen reported that "certain option grants during fiscal years 1995 through 2004 were accounted for improperly" and that "stock-based compensation associated with certain grants was misstated in fiscal years 1995 through 2005, and in the nine months ended March 31, 2006." Aspen also announced the results of an option accounting review undertaken by a panel of Board members stating: "The subcommittee identified errors related to the determination of the measurement dates for grants of options allocated among a pool of employees when the specific number of options to be awarded to specific employees had not yet been finalized, and other measurement date errors." Aspen Form 10-K, Sept. 28, 2006, at ii.

4

Within days, Katherine Rapine filed Rapine v. McArdle, et al., Civil Action 06-11879-RGS, alleging that Aspen's current and former directors and officers "authorized, modified, or failed to halt backdating of options in dereliction of their fiduciary duties to the Company as directors and officers, thus causing or allowing the Company to suffer millions of dollars in harm."[4]  Defendants moved to dismiss the Complaint asserting that Rapine had failed to plead particularized facts casting a reasonable doubt on the independence or disinterestedness of the Board.  Defendants also contended that the release given as part of the final judgment in Aspen Technology barred Rapine from bringing suit.[5]

───────────────

[4]Rapine filed the action in Middlesex Superior Court in October of 2006.  Aspen removed the case to this court on October 16, 2006.  Rapine filed an Amended Complaint on October 30, 2006.  The removed action has been consolidated with the instant case as the Complaints are virtually identical.

[5]On October 27, 2004, Aspen announced that its Audit Committee had determined that a software license transaction in fiscal year 2000 and a service agreement in 2001 had been improperly accounted for.  Several class action suits were filed in this court alleging securities laws violations on the part of Aspen and certain of its officers and directors. Fener v. Aspen Tech, Inc., 04-12375-JLT (D. Mass. Nov. 9, 2004); Stockmaster v. Aspen Tech., Inc., 04-12387-RCL (D. Mass. Nov. 10, 2004).  The defendant directors named in both actions were Lawrence B. Evans, Lisa W. Zappala, David L. McQuillin, Charles F. Kane, Stephen M. Jennings, Joan C. McArdle, Michael Pehl, Douglas A. Kingsley, Gary E. Haroian, Mark Fusco, Donald P. Casey, Stephen L. Brown, Joseph F. Boston, Douglas R. Brown, and Gresham T. Brebach.  The two actions were subsequently consolidated into Aspen Technology.  A separate set of plaintiffs filed a derivative action "on behalf of" Aspen against numerous of its officers and directors, including all but three of the defendants named in the Rapine Complaint alleging demand futility.  See Caviness v. Evans, 229 F.R.D. 354 (D. Mass. 2005).  Both the Aspen Technology and Caviness actions came to final judgment.  Judge Tauro dismissed the Caviness Complaint with prejudice on August 18, 2005, on grounds that plaintiffs had "failed to raise a reasonable doubt that, at the time the Complaint was filed, [Aspen's directors] were disinterested or independent" and "[a]s such, [Caviness] has not plead sufficient facts with particularity to demonstrate that demand on Aspen's Board was futile."  In Aspen Technology, the parties reached a proposed settlement on behalf of all persons who purchased Aspen common stock between October 29, 1999, and March 15, 2005.  On March 6, 2006, after notice to the class and a hearing, the court approved the settlement, and the case was dismissed

Thereafter, Deborah Risberg (who was not a party to the prior settlement and release) moved to intervene in the <u>Rapine</u> action, while simultaneously filing this separate lawsuit.[6]   The court denied the motion to dismiss in <u>Rapine</u>, holding that Risberg's intervention cured the settlement bar raised by the release entered in <u>Aspen Technology</u>. The court further held that consideration of the futility issue was premature as the motion directed the court to evidence outside of the pleadings.

Defendants now move to dismiss this newly filed litigation, arguing that Risberg has failed to plead demand futility with the required degree of particularity.   Defendants contend that at least four of the seven Board members were capable of exercising independent and disinterested judgment in responding to a litigation demand.   Moreover, defendants argue that Risberg's action is barred by the doctrine of issue preclusion stemming from Judge Tauro's finding in <u>Caviness</u> that there was no reasonable doubt that the same directors who are named as defendants in this action were disinterested or independent.

Risberg asserts that pre-suit demand on the Board was unnecessary based upon the following arguments:

(a) A Majority of the Directors (McArdle, Jennings, Casey, and Fusco) Participated in the Awarding of Backdated Option Grants, Which Was Not

---

with prejudice.  The settlement included a release by class members of all "possible" direct and indirect claims arising during the class period against Aspen and its present and former officers and directors.  No shareholder, including Rapine, objected to the settlement and release.  Nor did Rapine opt out of the settlement.

[6]Risberg's purchase of Aspen shares occurred prior to the Class Period (October 29, 1999, through March 15, 2005) settled and released in <u>Aspen Technology</u> - Master File No. 04-12375.

a Legitimate Exercise of Business Judgment;

(b) McArdle, Jennings, Casey, and Fusco also Face a Substantial Likelihood of Liability, Excusing Demand;

(c) McArdle, Jennings, Casey, Fusco, and Director Haroian Face a Substantial Likelihood of Liability Based on their Audit Committee Service;

(d) McArdle, Jennings, Casey, Fusco, and Haroian also Face a Substantial Likelihood of Liability Based on the Abdication of their Duties to Oversee Financial Reporting;

(e) Aspen's Directors Have Conceded their Inability to Disinterestedly or Independently Consider a Demand;

(f) The Board Faces a Substantial Likelihood of Liability for Covering Up the Scandal; and

(g) Demand is Not Required for Claims Raised under §14(a).

<u>DISCUSSION</u>

To survive a motion to dismiss, a complaint must allege "a plausible entitlement to relief." <u>Bell Atl. Corp. v. Twombly</u>, 127 S. Ct. 1955, 1967-1969 (2007) (disavowing the holding of <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957)). <u>See also</u> <u>Rodriguez-Ortiz v. Margo Caribe, Inc.</u>, 490 F.3d 92, 95-96 (1st Cir. 2007). The court "is not bound to credit bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like." <u>Centro Medico del Turabo, Inc. v. Feliciano de Melecio</u>, 406 F.3d 1, 5-6 (1st Cir. 2005), quoting <u>Aulson v. Blanchard</u>, 83 F.3d 1, 3 (1st Cir.1996). In addition to well-pleaded factual allegations, Rule 12(b)(6) permits the court to take into consideration matters of public record, including public filings with the Securities and Exchange Commission (SEC), <u>see</u> <u>Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.</u>, 267 F.3d 30, 33 (1st Cir. 2001), as well as documents incorporated in, central to, or materially referenced in the Complaint. <u>See</u> <u>Young v. Lepone</u>, 305 F.3d 1, 11 (1st Cir. 2002).

As a Delaware corporation, Aspen is governed by Delaware law. A "cardinal precept" of Delaware law is that "directors, rather than shareholders, manage the business

and affairs of the corporation." Arnold v. Soc'y for Sav. Bancorp, Inc., 678 A.2d 533, 540 (Del. 1996), citing Del. Code Ann. tit. 8, § 141(a).  A narrow exception to this rule is the derivative action, which in narrowly defined circumstances permits an individual shareholder to usurp control of the corporation in order to bring suit on behalf of the corporation against its officers and directors, as well as third parties.  Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 95-96 (1991).  As a prerequisite to bringing a derivative suit, a shareholder must demonstrate that the board wrongfully refused to act on behalf of the corporation or that a demand on the board to do so would have been futile. White v. Panic, 783 A.2d 543, 550 (Del. 2001).

Risberg made no demand on the Board and must therefore demonstrate demand futility.[7]  Because Risberg is challenging "more general board action or lack of action," rather than a specific "board decision," the relevant inquiry (as the parties acknowledge) is what has come to be known as the Rales test: whether the Complaint sets out particularized facts creating a "reasonable doubt" that, at the time the Complaint was filed, a majority of a board of directors could have exercised independent and disinterested

---

[7]It seems intuitive that Risberg should simply have made demand on the Board prior to instituting this litigation to avoid defending the inevitable motion to dismiss.

The answer is that if the board agrees to sue, the shareholder will lose control over the suit, and if the board declines to sue, the courts will not entertain the shareholder's derivative suit unless the board's decision can be proved not to have been a valid exercise of business judgment. Furthermore, by making a demand, the shareholder concedes that the board was sufficiently disinterested and independent to consider the demand.

In re Sonus Networks, Inc, S'holder Derivative Litig., 499 F.3d 47, 67 n.11 (1st Cir. 2007) (internal citations omitted).

business judgment in responding to a litigation demand.[8]  See Rales v. Blasband, 634 A.2d 927, 934 (Del. 1993). In other words, Risberg must cast a reasonable doubt on the ability of at least four of the current seven Aspen directors (all of whom were appointed before the suit was filed) to have exercised independent and disinterested judgment in deciding whether to proceed with a lawsuit.  The Board members as of the date the Complaint was filed were Donald Casey, Mark Fusco, Gary Haroian, David McKenna, Michael Pehl, Stephen Jennings and Joan McArdle.

A director is "interested" if he or she will be "materially affected, either to his benefit or detriment, by a decision of the board, in a manner not shared by the corporation and the stockholders." Seminaris v. Landa, 662 A.2d 1350, 1354 (Del. Ch. 1995). "In such circumstances, a director cannot be expected to exercise his or her independent business judgment without being influenced by the adverse personal consequences resulting from the decision."  Rales, 634 A.2d at 936.  A showing of a "mere threat of personal liability," however, is "insufficient to challenge either the independence or disinterestedness of directors."  Id.   Rather, a plaintiff must articulate particularized facts showing that a director faces "a substantial likelihood" of liability.  The court will consider each of Risberg's arguments that a demand would have been futile.

(a) McArdle, Jennings, Casey, and Fusco participated in the award of backdated

---

[8]Under Fed. R. Civ. P. 23.1, the right of a stockholder to bring a derivative suit is limited to situations where the directors have wrongfully rebuffed the stockholder's demand that the directors pursue corporate claims or where a demand is excused because the directors are incapable of making an impartial decision.  Massachusetts by contrast has a "universal demand" statute.  Under Mass. Gen. Laws c. 156D, § 7.42, "demand must be made prior to the commencement of every derivative case, whether or not the directors are independent with respect to the matter subject to the demand."

option grants – conduct which is not protected by the business judgment rule and therefore
they face "a substantial likelihood" of liability

Failure to make demand may be excused if a plaintiff can establish a reason to
doubt that a challenged act was the product of a board's valid exercise of business
judgment.  See Aronson v. Lewis, 473 A.2d 805, 812 (Del.1984).  This is not a matter of
mere pleading under Delaware law.   Chancellery Court Rule 23.1 requires that a
Complaint "allege with particularity the efforts, if any, made by the plaintiff to obtain the
action the plaintiff desires from the directors . . . and the reasons for the plaintiff's failure
to obtain the action or for not making the effort."  This means that a plaintiff must "comply
with stringent requirements of factual particularity that differ substantially from the
permissive notice pleadings."   Zimmerman ex rel. Priceline.com, Inc. v. Braddock, 2002
WL 31926608, at *7 (Del. Ch. Dec. 20, 2002), citing Brehm v. Eisner, 746 A.2d 244, 254
(Del. 2000).

Directors are protected by the deferential "business judgment rule," which "is a
presumption that in making a business decision the directors of a corporation acted on an
informed basis, in good faith and in the honest belief that the action taken was in the best
interests of the company."  Aronson, 473 A.2d at 812.  The rule, however, does not apply
when the decision challenged is one that was not taken by the board in existence at the
time the Complaint is filed.   "[W]here there is no conscious decision by the [existing]
corporate board of directors to act or refrain from acting, the business judgment rule has
no application."  Ryan v. Gifford, 918 A.2d 341, 352-353 (Del. 2007).

Risberg contends that a majority of the existing Board – McArdle, Jennings, Casey,
and Fusco – participated in the award of backdated options.  Defendants point out  that

10

Risberg "cannot allege that either Casey or Fusco were even on the Compensation Committee when any options were granted that were subsequently restated." To this, Risberg argues (unconvincingly) that

> if anything, since Plaintiff alleges that the most recent grant challenged (the August 15, 2003 grant) was backdated, the reasonable pleading inference is that this grant was awarded sometime between August 15, 2003 and October 28, 2004, when this grant was reported by the Compensation Committee (including Casey and Fusco) in the Company's 2004 annual proxy statement. Comp. ¶ 103. Moreover, even assuming, arguendo, that this grant was awarded sometime prior to the time that Casey and/or Fusco joined the Compensation Committee, both are alleged to have issued materially false and misleading statements in the Compensation Committee Report contained in that very same proxy statement. Defendants Casey and Fusco represented, inter alia, that all options granted in fiscal year 2004 were granted "with an exercise price equal to the fair market value on the date of the grant." Id.

Opposition Memorandum, at 13 n.16.

A derivative complaint must plead facts specific to individual directors sufficient to demonstrate that a majority could not have exercised disinterested business judgment. See Beam v. Stewart, 845 A.2d 1040, 1050-1051 (Del. 2004). Risberg's allegations simply do not comply with "the stringent requirements of factual particularity" required by Beam and Rales. Risberg asks the court to "assume" that the backdating occurred after Casey and Fusco joined the Board. However, the latest option alleged in the Complaint to have been backdated was granted on August 15, 2003.[9] Fusco joined the Board on December 9, 2003; Casey joined on an unspecified day in April of 2004. Fusco and Casey were appointed to the Compensation Committee in April of 2004. Directors Haroian, McKenna,

---

[9]As defendants' counsel pointed out at the hearing on the motion to dismiss, the date of the grant is confirmed by the Form 4 filed by Aspen with the SEC on August 20, 2003.

and Pehl never served on the Compensation Committee.[10]   None of the Directors is alleged to have received a backdated option.  When engaging in an inquiry as to whether a complaint in a derivative action pleads particularized facts sufficient to excuse demand on the board of directors of the corporation, a court does not "accept cursory contentions of wrongdoing as a substitute for the pleading of particularized facts." Desimone v. Barrows, 924 A.2d 908, 928 (Del. Ch. 2007).

      (b)-(d) A majority of the Board faces a substantial likelihood of liability

      Reasonable doubt as to whether a board member is "interested" (thereby excusing demand) is demonstrated when a plaintiff alleges material facts sufficient to support a substantial likelihood of personal liability.  Risberg asserts that there is such a likelihood on the part of McArdle, Jennings, Casey, Fusco, and Haroian based on their conduct as members of the Audit Committee "during the relevant period."  Pursuant to Aspen's charter, the Audit Committee is responsible for oversight of, among other things, "the integrity of the Company's financial statements";  "the Company's compliance with legal and regulatory requirements"; and "the performance of the Company's internal audit function . . . ."  Complaint ¶ 37.  Risberg claims that the liability of McArdle, Jennings, Casey, Fusco, and Haroian is "de facto" as they systematically failed to perform these delegated duties as reflected by Aspen's admissions and its filing and dissemination of

---

[10]If the fact of service on a Compensation Committee is by itself sufficient to imput knowledge of backdating to a director, see Conrad v. Blank, 2007 WL 2593540 (Del. Ch. Sept 7, 2007) (Staples), Risberg's Complaint implicates only Jennings and McArdle who are alleged to have been members of the Compensation Committee when the backdated grants were issued.

materially false and misleading financial statements (including the Annual Form 10-K).[11]

The standard of care establishing a director's breach of duty is one of gross negligence.  See Aronson, 473 A.2d at 812 ("Absent an abuse of discretion, that judgment will be respected by the courts. The burden is on the party challenging the decision to establish facts rebutting the presumption.").  However, where, as is the case with Aspen, the corporate charter broadly indemnifies board members for claims of breach of fiduciary duty, "a serious threat of liability may only be found to exist if plaintiff pleads a non-exculpated claim against the director based upon particularized facts." Guttman v. Huang, 823 A.2d 492, 501 (Del. Ch. 2003), citing In re Baxter Int'l, Inc. S'holders Litig., 654 A.2d 1268, 1270 (Del. Ch. 1995).  Moreover, in light of Aspen's indemnification policy to

> establish a "substantial likelihood of liability" on a claim based on nonfeasance, the plaintiff must plead facts showing the necessary conditions predicate for director oversight liability: (a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention.  In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations.  Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.

In re Sonus Networks, Inc., 499 F.3d at 67, quoting Stone v. Ritter, 911 A.2d 362, 370 (Del. 2006).  Risberg's claim of "de facto" liability falls well short of the pleading standard required to support a claim that a majority of the Board acted in conscious disregard of its

---

[11]It is not altogether clear what Risberg means by "de facto" liability, although the court assumes that she is arguing that liability is self-evident from the face of the referenced documents.

fiduciary obligations.

The same "de facto" argument raised by Risberg was rejected by Judge Tauro in

Caviness.  In that case, plaintiff contended that directors Fusco, Haroian, and McArdle

faced a substantial likelihood of liability because "the Audit Committee recommended that

the Board include the improper audited consolidated financial statements not just for one

quarter or for one year, but in Aspen's Annual Report on Form 10-K for FY:00, FY:01,

FY:02, FY:03 and FY:04."  Judge Tauro found that

> Fusco and Haroian served on the Audit Committee during only the 2004
> fiscal year. During Fusco's and Haroian's tenure, therefore, the Audit
> Committee recommended that the Board include improper audited financials
> on the Company's Form 10-K for just one year.  As Plaintiff implies in his
> own amended complaint, failing to detect improperly audited financials for
> just one year is insufficient to show that Fusco and Haroian face a
> substantial likelihood of liability because AspenTech indemnifies its directors
> against liability for ordinary breaches of the duty of care.  And while McArdle
> served on the Audit Committee from fiscal years 2000 through 2004,
> Plaintiff's conclusory allegation that McArdle  breached her supervisory
> duties, without more, fails to raise a reasonable doubt that McArdle is
> disinterested.

Caviness, 229 F.R.D. at 359-360.

Judge Tauro also distinguished the same cases that Risberg cites as excusing a

pre-suit demand in this case.

> Plaintiff's reliance on In re Abbott Laboratories[12] and In re Oxford Health
> Plans, Inc.[13] is misplaced.  In Abbott Laboratories, the Seventh Circuit found
> that demand was excused where Audit Committee members knew of the
> company's noncompliance with Food and Drug Administration regulations,

---

[12]In re Abbott Labs. Derivative S'holders Litig., 325 F.3d 795, 806, 809 (7th Cir.
2003).

[13]In re Oxford Health Plans, Inc., Secs. Litig., 192 F.R.D. 111, 114-115 (S.D.N.Y.
2000).

and the company failed to act for six years.  In <u>Oxford Health Plans</u>, the District Court concluded that demand was futile where the complaint indicated, among other things, that Audit Committee members were aware of problems, such as insufficient financial controls and "repeated misrepresentations to the financial markets regarding the extent and likely duration of [the company's] financial crisis," and still allowed the company "to continue its rapid and aggressive campaign of growth."  Such facts are not present in this case.

<u>Caviness</u>, 229 F.R.D. at 360.  <u>See</u> <u>In re Xcel Energy, Inc.</u>, 222 F.R.D. 603, 607 (D. Minn. 2004)  (under Delaware law, generalized statements that Audit Committee members "knew or should have known" of false statements do "not constitute facts pleaded with particularity"); <u>see</u> <u>also</u> <u>Guttman</u>, 823 A.2d at 501("Nothing in the complaint provides any particularized basis to infer that these outside directors had any idea about the questionable accounting practices."); <u>Rattner v. Bidzos</u>, 2003 WL 22284323, at *10 n.53 (Del. Ch. Oct. 7, 2003) (conclusory allegations of knowledge of wrongdoing based on a defendant's status as a director do not satisfy the demand futility pleading standard); <u>In re Sonus Networks, Inc., Derivative Litig.</u>, No. 040753, 2004 WL 2341395, at *4 (Mass. Super., Sept. 27, 2004) ("generalized allegations reflecting poor supervision over financial statements" by members of an Audit Committee and other directors do not excuse a pre-suit demand).

Defendants further assert that because the <u>Caviness</u> court previously rejected Risberg's demand futility theories as a matter of law, the doctrine of preclusion bars her from relitigating these same theories.  Where, as here, both the potentially precluding suit and the potentially precluded suit were litigated in federal court pursuant to federal question jurisdiction, federal law governs the *res judicata* (preclusion) effects of a federal court judgment as "applied to a later case that again presents a federal question to a

15

federal court." Gonzalez v. Banco Cent. Corp., 27 F.3d 751, 755 (1st Cir.1994). Cf. Semtek Int'l Inc. v. Lockheed Martin Corp., 531 U.S. 497, 506-508 (2001) (the *res judicata* jurisprudence of the forum state is to be applied in diversity cases). The First Circuit has defined the following as the ingredients of a valid issue preclusion claim: "(1) both the . . . proceedings involved the same issue of law or fact; (2) the parties actually litigated the issue in the [prior] proceeding[ ]; (3) the [first] court actually resolved the issue in a final and binding judgment . . . ; and (4) its resolution of that issue of law or fact was essential to its judgment (i.e., necessary to its holding)." Monarch Life Ins. Co. v. Ropes & Gray, 65 F.3d 973, 978 (1st Cir.1995). See also Global Naps, Inc. v. Massachusetts Dep't of Telecomm. and Energy, 427 F.3d 34, 44 (1st Cir. 2005); In re Bankvest Capital Corp., 375 F.3d 51, 70 (1st Cir. 2004).

There is no dispute that the Caviness action concluded with a final judgment on the merits based on the heavily litigated issue of demand futility and that the issue was essential to the entry of a dismissal with prejudice. Because it is settled law that the true party in interest in a derivative action is the corporation and not the individual shareholder, there is also an identicality of the parties (that is, Risberg is Aspen).

The remaining portion of the test (that the proceedings involve the same issue of law or fact) is less clear. Defendants assert that the demand futility issues in this case are identical to those raised in Caviness: "The restatement [of financials] came as the result of a self-initiated board review conducted by the same board of directors determined in Caviness to be independent and disinterested." Risberg challenges the independence of nearly all of the same directors who figured in the Caviness litigation (all but one of the

16

Aspen directors named as defendants in Risberg's Complaint served on the Board when the events litigated in <u>Caviness</u> took place).[14]   However, Risberg maintains that the seminal activity underlying the <u>Caviness</u> action – accounting improprieties – share no similarity in degree or kind with the backdating activity that underlies her Complaint.   The distinction Risberg draws is between conduct (accounting irregularities) that is not directly attributable to the Board, and conduct (backdating) that is initiated by the Board itself. Although the issue of law (demand futility) is the same in both cases, the factual dissimilarities may have a bearing on the ultimate issue.   <u>See</u> <u>In re Sonus Networks, Inc.</u>, 499 F.3d at 62-63.

While the parties' arguments on the last element of the test are not easily dismissed, there is no need for the court to decide the issue.   I agree with Judge Tauro's reasoning in <u>Caviness</u>, and conclude as he did in that case, that Risberg has failed to raise a reasonable doubt that McArdle, Jennings, Casey, Fusco, and Haroian were independent and disinterested.   <u>See</u> <u>Caviness</u>, 229 F.R.D. at 360 n.46 (holding that generalized statements that Audit Committee members "knew or should have known" of false statements did "not constitute facts pleaded with particularity").

(e)   <u>The Aspen directors have conceded their inability to disinterestedly or independently consider a demand</u>

Risberg asserts that by forming a "special Board subcommittee to supposedly investigate the option backdating . . . Aspen directors . . . effectively conceded that they are incapable of properly considering a demand."   Opposition Memorandum, at 22.   In

---

[14]The remaining director, David McKenna, was appointed three weeks before Risberg filed the Complaint. McKenna is not named as a defendant.

Seminaris, 662 A.2d at 1352, the Chancery Court rejected the same argument in a factually similar case.  The Court held that the Seminaris board had not conceded the issue of demand futility by authorizing a special committee of outside directors to investigate the veracity of a former chief executive officer's statements to the SEC.  Id. at 1352-1353 ("[A] disinterested board of directors does not waive its right to control derivative litigation merely by delegating that control to a special committee.").  Apart from her undifferentiated indictment of the Board, Risberg recites the mantra that Aspen has "conceded that Fusco, Pehl and McKenna lack independence," as if repetition were evidence.  Risberg makes this assertion without any citation to the record, which is understandable, as there is nothing in the record that even remotely supports such a concession.

> (f) The Board faces a substantial likelihood of liability for covering up the scandal

There are no facts plead in the Complaint supporting Risberg's accusation of a "coverup."[15]  Risberg simply states that the current Board omitted from its disclosures "any mention of which directors, officers, or other employees were found by the investigating subcommittee to have participated or acquiesced in the option backdating scheme." Opposition Memorandum, at 24. At the motion hearing, Risberg's counsel defended the lack of factual support by lamenting the difficulties faced by a shareholder in gathering information controlled by the corporation.  However, stockholders of Delaware corporations have a common-law and statutory right to inspect the corporation's books and records. 8

---

[15]The SEC in fact commended Aspen for taking significant remedial steps and cooperating extensively with enforcement authorities by "promptly self-reporting . . . and conducting a thorough internal investigation."  S.E.C. 07-152, 2007 WL 2186879.

Del. C. § 220.  See Guttman, 823 A.2d at 503 & n.25 ("[Plaintiffs] have thus ignored the

repeated admonitions of the Delaware Supreme Court and this court for derivative plaintiffs

to proceed deliberately and to use the books and records device to gather the materials

necessary to prepare a solid complaint."); Saito v. McKesson HBOC, Inc., 806 A.2d 113,

117  (Del. Super. 2002) (under Delaware law stockholder who had an interest in pursuing

claims for alleged accounting irregularities at one of the merging companies was entitled

to inspect documents obtained from the merged corporation's financial and accounting

advisors).  Risberg never availed herself of her right to inspect Aspen's books and records.

    (g) A demand is not required for claims based on section 14(a)

    Risberg also contends that section 14(a) should be treated as creating a special

species of derivative claim not subject to the demand requirement or the business

judgment rule.  The argument is based on the holding of Vides v. Amelio, 265 F. Supp. 2d

273 (S.D.N.Y. 2003).  In Vides, the complaint asserted a claim of distribution of a false and

misleading proxy solicitation at the defendant's annual meeting in violation of § 14(a) of

the Exchange Act, 15 U.S.C. § 78n(a).  Defendant sought dismissal of the complaint,

arguing that plaintiff had failed to make a pre-suit demand on the directors "to obtain the

business judgment of the board on whether the litigation is in the best interests of the

corporation and its shareholders."  Id. at 275.  The court held the business judgment rule

inapplicable to disclosures in a proxy statement.

> [T]he goal of § 14(a) that communications from management be accurate
> and complete as to all material facts is a vital one.  Its achievement would
> be quite clearly frustrated if a director who was made a defendant in a
> derivative action for providing inadequate information in connection with a
> proxy solicitation were permitted to cause the dismissal of that action simply
> on the basis of his judgment that its pursuit was not in the best interests of

the corporation.  The very premises which give life to a derivative right of action to enforce § 14(a) must save it from a premature death.  In short, we conclude that to the extent that a complaint states claims against directors under § 14(a) upon which relief may be granted, federal policy prevents the summary dismissal of those claims pursuant to the business judgment of those defendant directors.

Id. at 276.  No First Circuit case has ever followed Vides.  Nor has any other court in the

Southern District.  As one district court reasoned in refusing to follow Vides:

It is axiomatic that "decisions of a corporation, including the decision to initiate litigation, should be made by the board of directors."  Kamen, 500 U.S. at 101 (quotations omitted); see also Spiegel, 571 A.2d at 773.  So, although the board may not be best positioned to determine whether Section 14(a) has been violated, the law regards the board as best positioned to make the business decision as to whether derivative litigation should be initiated to remedy such a potential violation.  In fact, even if Section 14(a) has been violated, the board might reasonably determine that it is not in the best interests of the corporation to pursue derivative litigation.  For example, it might cost the corporation more to enforce its rights under Section 14(a) than the corporation could possibly recover through the successful prosecution of a lawsuit.  On the other hand, should the board find that Section 14(a) litigation is in the best interests of the corporation, the law regards the board as best situated to determine how resources should be spent on that litigation.  The business judgment rule is simply a means to acknowledge that the board is better positioned to weigh the comparative risks and benefits of the initiation and conduct of litigation than is a court.

St. Clair Shores Gen'l Employees Retirement Sys. v. Libeler, 2006 WL 2849783, *6

(S.D.N.Y. Oct. 4, 2006).

## ORDER

For the foregoing reasons, defendants' motion to dismiss the Complaint for plaintiff's

failure to make a pre-suit demand is ALLOWED. The Clerk may now close the case.

SO ORDERED.

/s/ Richard G. Stearns

_____

20

UNITED STATES DISTRICT JUDGE